UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Catholic Medical Center

     v.                                 Civil No. 14-cv-180-JL
                                           Opinion No. 2015 DNH 110

Fireman's Fund
Insurance Company

**OPINION AND ORDER**

The possible contamination of surgical instruments after exposure to a communicable neurological disease--and whether those instruments constitute "premises" under the terms of an insurance policy--led to a coverage dispute that culminated in this litigation.  Plaintiff Catholic Medical Center ("CMC") seeks a declaratory judgment that defendant Fireman's Fund Insurance Company ("Fireman's Fund") wrongfully denied coverage for certain losses after a CMC neurosurgical patient was diagnosed several months after surgery, necessitating the destruction of the potentially contaminated instruments and causing temporary suspension of CMC's neurosurgery program.  The parties have filed cross-motions for summary judgment.  Having reviewed the insurance policy at issue and the undisputed factual record, and having held oral argument, the court finds that CMC's claims are not covered.  Fireman's Fund's motion is therefore granted; CMC's is denied.

## I.  <u>Summary Judgment</u>

Summary judgment is properly granted when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(a).  The court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving" parties.  Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  On cross-motions for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn."  Merchants Ins. Co. of N.H., Inc. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998) (quotation marks omitted).  This rule is largely academic here since, as previously noted, the material facts are undisputed.

## II.  <u>Factual Background</u>

On May 24, 2013, CMC personnel performed neurosurgery on a patient.  Several months after the surgery, CMC learned that the patient was experiencing symptoms consistent with Cruetzfeldt-Jakob Disease ("CJD"), a communicable, incurable and fatal neurological disease.  A lab test in mid-August 2013 established that the patient likely had CJD.  The patient died soon after and post-mortem analysis confirmed the CJD diagnosis.  CMC also determined that eight patients had undergone neurosurgery at CMC

since May 24, 2013.  CMC had two sets of neurosurgery instruments, so it was possible that some, none, or all of these eight patients underwent surgery with the same instruments used on the CJD patient, potentially exposing them to the disease.

CMC reported the incident to the New Hampshire Department of Health and Human Services ("New Hampshire HHS"), as required by law because CJD is a communicable disease.  Representatives from New Hampshire HHS met daily with CMC personnel to formulate a response.  Since it could not be determined which of the two surgical kits was used on the original patient, New Hampshire HHS advised CMC that both kits had to be decontaminated, a process that will result in the destruction of the instruments.[1] Although DHHS had the authority to issue a formal order requiring CMC to take steps in response to the CJD incident, it did not do so because CMC had already taken the required steps or agreed to do so without resistance.

Aside from quarantining the affected instruments and issuing various notifications to the public and the eight post-incident surgical patients, CMC undertook no other action, such as additional decontamination, evacuation or operating room closure. CMC was, however, forced to suspend its neurosurgery program from

_____

[1]CMC is maintaining the instruments in quarantine until all potential legal claims resulting from the CJD incident are resolved.  The instruments will be incinerated thereafter.

August 16, 2013 until February 24, 2014, when it completed its
purchase of new instruments.

CMC notified Fireman's Fund of a potential claim as soon as
it became aware of the CJD incident, and later filed a formal
claim for the loss of the surgical instruments and losses
occasioned by the suspension of CMC's neurosurgery program.
Fireman's Fund denied the claim as a non-covered loss, and also
denied CMC's subsequent request to reconsider its position.  CMC
filed suit in New Hampshire Superior Court in March 2014.
Fireman's Fund timely removed the case to this court.

III.  **The Insurance Policy**

During the relevant time period, Fireman's Fund insured CMC
pursuant to a Commercial Property policy.  As pertinent to this
case, the policy includes two endorsements.  The first is a
Health Care Extension Endorsement, which, in turn, includes
Communicable Disease Coverage, which provides, in relevant part:

> 13. Communicable Disease Coverage
>
> a.  We will pay for the following under
> Communicable Disease Coverage:
>
> (1) Direct Physical loss or damage to
> Property Insured caused by or resulting from a covered
> **communicable disease event** at the **premises** described in
> the Declarations.
>
> (2) The necessary costs incurred to:

           (a) Test, monitor, contain, treat, detoxify, disinfect, and neutralize Property Insured;

           (b) Cleanup, remove, and dispose of the debris of Property Insured.

           (c) Replace consumable goods at the **premises** described in the Declarations which are declared contaminated by the local **public health authority**.

           (3) If the Declarations show you have Business Income with Extra Expense Coverage - 190004, we will pay for the actual loss of **business income, rental value**, or necessary **extra expense** or expediting expense that you sustain due to the necessary full or partial suspension of **operations** during the **period of restoration**. The suspension must be caused by direct physical loss or damage caused by or resulting from a covered **communicable disease event** at the **premises** described in the Declarations.

(Emphasis in original).

The policy also contains a Crisis Management Coverage Extension Endorsement, which obligates Fireman's Fund to cover certain losses resulting from a "covered crisis event."  The pertinent policy provision defines such an event as:

Necessary closure of your covered premises due to any sudden, accidental and unintentional contamination or impairment of the **covered premises** or other property on the **covered premises** which results in clear, identifiable, internal or external visible symptoms of bodily injury, illness, or death of any person(s). This includes **covered premises** contaminated, by **communicable disease**, Legionnaires' disease, but does not include premises contaminated by other **pollutants** or **fungi**.

(Emphasis in original).

As is often the case in insurance policies, the emphasized terms have been assigned particular meanings.  "Premises" is defined as "that part of the location you occupy."  The Endorsement defines "communicable disease" as "any disease caused by a biological agent that may be transmitted directly or indirectly from one human or animal to another" and defines "communicable disease event" as an "event in which a **public health authority** has ordered that the **premises** described in the Declarations be evacuated, decontaminated, or disinfected due to the outbreak of a **communicable disease** at such **premises**." (emphasis in original).  Finally, with respect to the Crisis Management Endorsement, "covered premises" are defined as "that part of the location you occupy which is covered by this policy, including the area within 100 feet thereof."

## III.  <u>Analysis</u>

## A.  <u>Policy Interpretation</u>

The parties agree that New Hampshire law controls this dispute.  Therefore, the insurer, Fireman's Fund, bears the burden of proving that CMC's claim is not covered.  <u>See</u> N.H. Rev. Stat Ann. § 491:22-a (2010); Andrews v. Nationwide Mut. Ins. Co., 124 N.H. 148, 150 (1983) (holding that provisions of New Hampshire's Declaratory Judgment Act relating to liability insurance apply to first-party insurance claims).

6

The interpretation of insurance policy language is a question of law for the court to determine. Rivera v. Liberty Mut. Fire Ins. Co., 163 N.H. 603, 606 (2012).  "Policy terms are construed objectively; where the terms are clear and unambiguous, [the court] accord[s] the language its natural and ordinary meaning." Barking Dog, Ltd. v. Citizens Ins. Co. Of Am., 164 N.H. 80, 83 (2012).  Where disputed terms are not defined in the policy, the court construes them "in context, and in the light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured." Great Am. Dining v. Philadelphia Indem. Ins. Co., 164 NH 612, 625 (2013).  If policy terms are clear and unambiguous, the "search for the parties' intent is limited to the words of the policy." White v. Vt. Mut. Ins. Co., 167 N.H. 153, 157 (2014).  "Ambiguity exists if reasonable disagreement between contracting parties leads to at least two interpretations of the language." Id. (quoting Colony Ins. Co. v. Dover Indoor Climbing Gym, 158 N.H. 628, 630 (2009)). "If one of the reasonable meanings of the language favors the policyholder, the ambiguity will be construed against the insurer." Colony, 158 N.H. at 630.  However, the court will not "perform amazing feats of linguistic gymnastics to find a purported ambiguity[,]" id. at 630-31, and will "enforce a policy provision that limits the insurance company's liability when the

7

policy language is clear and unambiguous." Merch. Mut. Ins. Co. v. Laighton Homes, Inc., 153 N.H. 485, 487 (2006).[2]

1.  Communicable Disease Coverage

Fireman's Fund makes several arguments in support of its position that the policy's Communicable Disease Coverage does not apply to CMC's claim.  Fireman's Fund's overall point, however, is that the CJD incident did not constitute a "communicable disease event," as that term is defined in the policy.  The court agrees.

As previously noted, the policy defines a "communicable disease event" as "an event in which a **public health authority** has ordered that the **premises** described in the Declarations be evacuated, decontaminated, or disinfected due to the outbreak of **communicable disease** at such **premises**" (emphasis in original). Fireman's Fund specifically contends that:  1) there was no evacuation, decontamination or disinfection of "the premises"; 2) there was no "outbreak" of a communicable disease; 3) no public health authority "ordered" any action; and 4) there was no "direct physical loss or damage to any insured property."  The first point carries the day.

---

[2]While the parties agree as to the law governing policy interpretation, the court is not aware of any case law regarding the policy provisions at issue and the parties supply none.

CMC argues that no policy language would lead a reasonable insured to conclude that coverage to the instruments would only be triggered if the entire premises were disinfected, decontaminated or evacuated.  To the contrary, the plain language leads precisely to that conclusion.

Restating the relevant provision, the policy defines "premises" as "that part of the location you occupy."  Engrafting that definition onto that of a "communicable disease event" yields "an event in which a public health authority has ordered that <u>that part of the location that [CMC] occup[ies]</u> be evacuated, decontaminated or disinfected . . . ."  The parties do not dispute that the only action taken was with respect to the possibly contaminated surgical instruments and that there was no evacuation, decontamination or disinfection of any other part of the hospital.

Given this policy language, the existence of a "communicable disease event" serves as an important gateway to coverage.  But CMC essentially ignores this step and offers no reasonable explanation as to how surgical instruments can be considered "premises," a term which connotes a location.  Instead, CMC relies on the policy's coverage for damage to insured property-- such as surgical instruments--<u>at</u> the "premises."  But this proves too much.  Covered instruments <u>at</u> the premises are indeed

covered, but only, insofar as relevant here, if lost or damaged
as a result of a "communicable disease event," which requires not
just a disease outbreak at the "premises," but also that those
very same "premises," i.e., "that part of the location that CMC
occupies" be, inter alia, decontaminated.  This phrase, much like
"premises" itself, also connotes a physical location.  Reading
the two references to "premises" consistently and in context, the
court finds that the term refers to the physical structure of the
hospital.  Cf. Brickley v. Progressive N. Ins. Co., 160 N.H. 625,
629 (2010) (finding ambiguity where terms were defined
inconsistently in different parts of insurance policy). Indeed,
it would make little sense to read the policy as covering
instruments at the premises and to consider the instruments also
to be premises.

     Finally, CMC invites the court to find ambiguity by citing
internal Fireman's Fund communications showing that there was, at
some point in the claims handling process, disagreement among
Fireman personnel as to the breadth of the definition of
"premises," with two Fireman's Fund employees seemingly favoring
CMC's position.  The court declines the invitation as it is
improper to resort to such extrinsic evidence where, as here, the
policy provision is not facially ambiguous.  See In re Reid, 143
N.H. 246, 249 (1998) (noting, in context of lease interpretation,

10

"[w]e will reverse the determination of the fact finder where, although the terms of the agreement are unambiguous, the fact finder has improperly relied on extrinsic evidence in reaching a determination contrary to the unambiguous language of the agreement.").[3]

Against this backdrop, the court finds that the Fireman's Fund's Communicable Disease Coverage does not cover CMC's claim.[4]

## 2. Crisis Management Coverage

CMC argues that the Crisis Management Coverage Extension Endorsement covers the losses it sustained when it had to suspend its neurosurgery program in the absence of surgical instruments. Once again, though, the policy language does not support such a conclusion.  While CMC is correct that the policy covers various losses caused by "suspension of operations," such suspension must be the result of a "covered crisis event," which requires

---

[3]The court also notes that while any such extrinsic evidence is for the purpose of determining the parties intent in the absence of clear policy language, CMC's putative evidence does not do that.  The claims process, incepting long after the policy was drafted, has little to do with the parties' intent.  Indeed, under CMC's novel theory, unless all of an insurer's claims-handling personnel agreed with the ultimate decision from the outset of the claim, insureds would be entitled to coverage based on an "ambiguity."  There appears to be no authority for that proposition.

[4]The court need not rule on Fireman's Fund's other theories: lack of an "outbreak"; lack of a public health authority order; and lack of direct physical loss.

"closure of the covered premises."  CMC argues that coverage of
"suspension" is internally inconsistent with the requirement of
"closure," and that the provision is therefore ambiguous.
Relatedly, it argues that Fireman's Fund's position ignores the
"suspension" coverage.  The court finds both arguments wanting.
The policy is clear that only "a suspension . . . caused by or
result[ing] from a 'covered crisis event'" is covered.  Here,
again, CMC's argument ignores the threshold requirement of a
"covered crisis event"--defined as requiring closure of the
premises--and focuses solely on the resulting damage.  Similarly,
any inconsistency between coverage for "suspension of operations"
and "closure of premises" is irrelevant because only the latter
term in contained within the threshold definition of "covered
crisis event."  Thus, CMC's loss is not covered under the Crisis
Management Coverage Extension Endorsement.

## IV.  **Conclusion**

Eschewing, as it must, "linguistic gymnastics," the court
finds that, as relevant to CMC's claims, the Fireman's Fund
policy is not ambiguous and does not cover those claims.
Accordingly, Fireman's Fund's motion for summary judgment[5] is

---

[5]Document No. 15.

12

granted and CMC's motion for summary judgment[6] is denied.  The
clerk shall enter judgment accordingly and close the case.

        **SO ORDERED.**

                                        _____
                                        Joseph N. Laplante
                                        United States District Judge

Dated: June 1, 2015

cc:   Donald L. Smith, Esq.
      Gregory P. Varga, Esq.
      Raymond T. DeMeo, Esq.
      Danielle Andrews Long, Esq.

_____

    [6]Document No. 14.

13